IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Meredith Cook, | ) | Civil Action No. 6:14-1294-JMC-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on April 29, 2004, alleging that she became unable to work on June 1, 1998. The application was denied initially and on reconsideration by the Social Security Administration. On July 3, 2005, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared on December 12, 2007, considered the case *de novo*, and on March 28, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the

---

[1]A report and recommendation is being filed in this case in which one or both parties declined to consent to disposition by the magistrate judge.

Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 14, 2009.  On October 7, 2009, the plaintiff filed an action for judicial review in this court, and, on March 23, 2011, the case was remanded to the Commissioner for further investigation or explanation relating to the ALJ's credibility determination and assessment of the physician's opinions (Tr. 590-617).  On November 6, 2012, the plaintiff and Leanna L. Hollenbeck, an impartial vocational expert, appeared at a hearing before the same ALJ.  On March 8, 2013, the ALJ again found the plaintiff was not disabled (Tr. 506-57). The ALJ's finding became the final decision of the Commissioner of Social Security on February 10, 2014, when the Appeals Council considered the plaintiff's exceptions and "found no reason . . . to assume jurisdiction" (Tr. 469-72).  On April 9, 2014, the plaintiff filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant has not engaged in substantial gainful activity since April 29, 2004, the application date (20 C.F.R § 416.971 *et seq*.).

(2)    The claimant has the following severe impairments: fibromyalgia and degenerative joint disease of the right shoulder status post dog bite injury (20 C.F.R. § 416.920(c)).

(3)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926).

(4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except the claimant could occasionally lift 20 pounds and 10 pounds frequently; the claimant could sit, stand, and walk up to six hours each out of an eight-hour workday; the claimant can never climb ladders, ropes, and scaffolds; the claimant could frequently climb ramps and stairs, balance, kneel, stoop, crouch, and crawl; and the claimant could occasionally reach overhead with the right upper

2

extremity. The claimant should avoid concentrated exposure to hazards.  The claimant is limited to simple, one- or two-step tasks.

(5)    The claimant has no past relevant work (20 C.F.R. § 416.965).

(6)    The claimant was born on December 14, 1972, and was 31 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

(7)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since April 29, 2004, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and

4

requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### EVIDENCE PRESENTED

The plaintiff was 31 years old on the date she filed for benefits and 40 years old on the date of the ALJ's decision (Tr. 556-57). She has a high school education and no past relevant work.

On May 5, 2002, the plaintiff went to Mary Black Memorial Hospital emergency room for complaints of severe right arm pain, causing an inability to sleep the night before. Discharge instructions included wearing a sling, moist heat, limit use of arm, and follow-up with Melvin Medlock, M.D. (Tr. 175-80). She returned to the emergency room on June 2, 2002, with continued complaints of right arm and shoulder pain. The notes show that the complaints of pain could be because of chronic blood clots. She was instructed to elevate her arm above her heart, to use heat for three days and to follow-up with Dr. Medlock within 48 hours (Tr. 170-74). Dr. Medlock was the plaintiff's primary care provider

from 2002 through 2007. He treated the plaintiff for fibromyalgia, dog bite injuries, and other routine concerns. Dr. Medlock saw the plaintiff about every two-to-four weeks for her fibromyalgia. He recorded her reported symptoms and prescribed narcotic pain medication. The plaintiff routinely reported pain in her neck, hips, knees, elbows, and hands (Tr. 261, 262, 263, 264, 283, 290, 291, 293, 370, 371). When recorded, the plaintiff generally rated her pain around 8 or 9 on a scale of 1-10 (Tr. 258, 261, 262, 269, 368, 372, 373).

The plaintiff was referred to Carol Kooistra, M.D., in August 2002 for pain management. The plaintiff described diffuse pain in her arms, spine, and low back. On examination, Dr. Koositra found no palpable nodes on her neck, normal thyroid, and no edema (Tr. 338). She noted "multiple trigger points in the plaintiff's neck, cervical spine, pectoral, deltoid, and upper and lower extremities" (Tr. 338). Dr. Kooistra's impression was fibromyalgia (Tr. 339).

Dr. Medlock began treating the plaintiff's reported pain with Oxy IR (fast-release oxycodone, a narcotic pain reliever) and Oxycontin (oxycodone) in December 2002 (Tr. 294-95). On December 4, 2002, the plaintiff reported cold, discolored fingers on her right hand. She also reported that when the color returned, her fingers were painful, with throbbing and tingling. On December 19, 2002, her anti-nuclear factor ("ANF") and rheumatoid factor tests were within normal limits (Tr. 294). On January 13, 2003, the plaintiff complained of tenderness over the lumbar spine near the sacroiliac joint and over her right hip; she had accentuated deep tendon reflexes. X-rays were normal, and Dr. Medlock diagnosed the plaintiff with possible bursitis (Tr. 293). In March 2003, she was tender over the costal chondral junctions in multiple sites. Dr. Medlock diagnosed the plaintiff with chest pain secondary to chondritis (Tr. 288). He also noted her fibromyalgia was "about the same," and the plaintiff was not tolerating a lot of exercise (Tr. 284). In April 2003, the plaintiff had some tenderness and minute swelling of the right second metacarpal joint (Tr. 286). At office visits in May and June 2003, the plaintiff reported pain in her neck

(Tr. 281-83).  At an office visit on June 2, 2003, Dr. Medlock opined that the plaintiff's diagnoses included fibromyalgia and myatonia of the cervical muscles, probably related to her fibromyalgia (Tr. 281).

Following a dog bite injury around September 2003, Dr. Medlock assessed cellulitis, but found no lymphadenopathy (swollen glands) or thrombosis (blood clot).  The plaintiff's arm wounds recovered well following therapy (Tr. 269-74).  When the plaintiff continued to report soreness in her right shoulder, Dr. Medlock referred her to orthopaedist Anthony Sanchez, M.D., for evaluation (Tr. 262).  Dr. Medlock opined that the plaintiff likely suffered a strain or sprain when the dog was putting a lot of traction on her arm.  He noted that tenderness at the glenohumeral joint (Tr. 274).

At an office visit with Dr. Kooistra on November 19, 2003, the plaintiff reported her recent dog bite and reported injuries to her perioral and left hand area, but mostly to the right bicep region.  Dr. Kooistra noted that the plaintiff had increased pain and restricted movement and noted a question about a right rotator cuff tear.  The doctor also noted that the plaintiff's fibromyalgia symptoms had increased mildly, especially in her low back, knees, and hips.  Her examination revealed palpable knots subcutaneous in the right upper extremity with limited elbow and shoulder range of motion.  Dr. Kooistra also noted a local tremor, especially in the right upper extremity (Tr. 330).

On January 7, 2004, Dr. Medlock noted that the plaintiff's swelling and induration from her injury might be permanent and noted greater fullness of the distal bicep area on the right than the left (Tr. 272).

On January 11, 2004, W.B. Hopkins, M.D., a state agency reviewing physician, completed a physical residual functional capacity ("RFC") assessment and found that the plaintiff could perform a limited range of light work (Tr. 201-08).  Dr. Hopkins' review of the records revealed that, despite the plaintiff's claims of pain all over, she had a normal gait and station, full range of motion of all joints other than her right arm, normal motor and

7

sensory function, a general ability to squat and rise, and the ability to heel, toe, and tandem walk (Tr. 549). The records also showed that the plaintiff could fully abduct and flex her right shoulder, and she had good grip strength. She also had good range of motion of the cervical and lumber spine (*id.*).

On examination with Dr. Kooistra in February 2004, multiple trigger points were found in the plaintiff's arm, where she had scars from the dog bites (Tr. 329). Nerve conduction studies on February 24, 2005, showed reduced right biceps CMAP with denervation, most likely due to reduced muscle mass (Tr. 317-19).

In March 2004, Dr. Medlock summarily assessed the plaintiff with anxiety or depression and prescribed diazepam (Tr. 271). In May 2004, Dr. Kooistra noted the plaintiff was doing relatively well on Neurontin and Topamax (Tr. 328).

James Ruffing, Psy.D., examined the plaintiff at the request of the Commissioner on October 4, 2004, regarding her allegations of depression (Tr. 181-83). The plaintiff informed Dr. Ruffing that her depression had not been a problem in the past nine to twelve months (Tr. 182). She indicated she was not depressed on the day of the examination. She also stated that her depression had responded well to medication. The plaintiff described daily activities of reading, trying to work on her computer, painting, napping, playing with her pets, and walking around the yard if she was able (Tr. 182). Dr. Ruffing's impression was adjustment disorder with depressed mood, apparently in remission in response to her psychotropic interventions (Tr. 183).

On October 5, 2004, the plaintiff reported that her condition had worsened and that she was in pain, particularly in her right knee. Dr. Medlock noted that there was no effusion or instability and that she could extend it fully with some effort (Tr. 263). The plaintiff returned to the clinic on November 29, 2004, with complaints of increasing pain in her right shoulder. She also reported that she had pain in multiple joints, which Dr. Medlock opined was likely related to her fibromyalgia (Tr. 262).

8

On November 1, 2004, Karen L. Scott, Psy.D., a state agency reviewing psychologist, reviewed the record and found that the plaintiff's mental conditions were nonsevere. Dr. Scott noted the plaintiff responded well to medications and denied depression for the last nine months. The plaintiff's concentration, persistence, and pace were within normal limits, and there was no evidence of significant social limitations (Tr. 184-96).

Larry Korn, D.O, examined the plaintiff at the request of the Commissioner on December 29, 2004 (Tr. 198-200). The plaintiff reported a long history of musculoskeletal pain, with constant pain in her ankles, knees, and hips. She also described having a suppressed immune system and experiencing a traumatic dog bite injury to her right arm (Tr. 198). The physical examination revealed a scar in the mid-portion of her biceps and a slight palpable defect at the biceps muscle, as well as the overlying soft tissue and fat. Dr. Korn also noted that the plaintiff had full abduction and flexion of the shoulders, despite discomfort on the right. She could internally rotate to about 70 degrees on the right, but only externally rotate to about 50 degrees on the right with pain at the endpoint. Dr. Korn also noted weakness to resisted external rotation and graded the strength at 3/5 to 3+/5. Following the examination, Dr. Korn diagnosed 1) fibromyalgia, by stated history; 2) right rotator cuff deficiency; and 3) status post trauma of the right biceps muscle. Dr. Korn noted most of the plaintiff's deficits were related to subjective complaints of pain, with the exception of her right shoulder, which would cause her to have difficulty performing duties above shoulder level with her right arm where any force was required. Dr. Korn also noted that the plaintiff would have limitation in the amount of force she could apply with the shoulder where there was a need for normal strength with external rotation of the joint (Tr. 198-200). The plaintiff described her daily activities as including some reading, using the computer, and napping for two hours. A mental status examination was normal, and the plaintiff demonstrated a normal mood.

9

In January 2005, the plaintiff had persistent restriction of motion and acute pain in her right shoulder (Tr. 261). In February 2005, the plaintiff was tearful, depressed, and over-reactive (Tr. 259). Dr. Medlock discussed many options with the plaintiff. He recommended referral to a pain clinic, consultation with rheumatologist Kevin P. Tracy, M.D., and lifestyle changes. Specifically, he recommended the plaintiff quit smoking, exercise vigorously and work through the pain, and get out of the house (Tr. 259). Dr. Medlock also suggested the possibility of seeking psychiatric help. With respect to her pain, Dr. Medlock provided the plaintiff with an early prescription refill for her Oxycontin, but indicated this was the last time he would supply an early prescription refill (Tr. 259).[2] By her next visit, the plaintiff reported feeling better (Tr. 259). Nerve conduction studies in February 2005 were primarily normal, showing some changes in her right bicep likely due to her dog bite injury (Tr. 317-25).

Dr. Anthony A. Sanchez, M.D., an orthopaedic specialist, treated the plaintiff for right shoulder pain from February 2005 through June 2005 (Tr. 240-51). The plaintiff first saw Dr. Sanchez on February 9, 2005, when she reported right arm and shoulder pain following a dog attack injury in September 2003 (Tr. 250). She described pain in her right shoulder, worse with movement, that radiated to her wrist. She also reported experiencing tingling in her fingers. A physical examination by Dr. Sanchez revealed multiple scars around her shoulder, tenderness at the mid-brachium, and positive impingement signs. His impression was right shoulder pain. He scheduled her for an MRI and recommended physical therapy (Tr. 250). The MRI was unremarkable (Tr. 248, 251). Dr. Sanchez then assessed right shoulder impingement. He referred her to physical therapy and prescribed pain medication (Tr. 248). On March 30, 2005, the plaintiff returned to Dr. Sanchez with

---

[2] In March and April 2004, the plaintiff reported delay in receiving her Oxycontin through a patient assistance program and requested additional supplies of Oxycontin from Dr. Medlock while she was waiting for the mail order (Tr. 270-71).

continued complaints of right shoulder pain and difficulty raising her arm. Dr. Sanchez noted impingement signs remained positive and that the MRI revealed no rotator cuff tear or pathology. The plaintiff was sent to physical therapy for a rotator cuff strengthening program. Dr. Sanchez noted the plaintiff might benefit from a diagnostic and therapeutic subacromial injection (Tr. 248). By June 2005, the plaintiff's shoulder condition had improved, her condition was stable, and Dr. Sanchez discontinued her narcotic pain medication (oxycodone) (Tr. 240-41). Dr. Sanchez advised the plaintiff to maintain her rotator cuff strength and continue activity as tolerated (Tr. 240).

The plaintiff attended five physical therapy sessions in April and May 2005 (Tr. 242-47). On May 11, 2005, the plaintiff reported improvement in her range of motion and reported she was able to reach overhead and backward with less pain. Dr. Sanchez noted she should continue with physical therapy, but could be transitioned to the home program (Tr. 241). At the last visit, the plaintiff stated that her arm was fine and she needed to be discharged from physical therapy (Tr. 242).

In May 2005, the plaintiff reported that the Oxycontin was controlling her symptoms well (Tr. 257). In June 2005, the plaintiff's shoulder range of motion improved after physical therapy. She had some pitting edema in lower leg, minimal ankle edema, and trace edema in her feet (Tr. 256). Dr. Medlock continued prescribing Oxycontin for the plaintiff's chronic pain through July 2007 (Tr. 382). In addition to treating her with prescription narcotics, Dr. Medlock recommended physical therapy and vigorous exercise (Tr. 259, 261, 372, 383). In January 2006, the plaintiff had mild edema of the feet probably related to fibromyalgia (Tr. 373).

On June 6, 2005, Xanthia Harkness, Ph.D., a state agency reviewing psychiatrist, reviewed the record and found that the plaintiff's mental impairments were nonsevere, noting that the plaintiff responded well to medications, her concentration,

11

persistence, and pace were within normal limits, and there was no evidence of significant social limitations (Tr. 213-25).

The plaintiff began seeking treatment from Kevin P. Tracy, M.D., a rheumatologist, in June 2005. At her initial visit, the plaintiff reported being diagnosed with fibromyalgia years earlier (Tr. 345). She described debilitating pain, swelling, costochondritis, achilles tendonitis, sacroiliitis, sciatica, restless leg, irregular and painful menstrual cycles, foliculitis, bad allergies, reflux, low-grade fever, fever blisters, Raynaud's, hair loss, irritable bowel syndrome, migratory glossitis, and familial benign tremor. With respect to her fibromyalgia symptoms, the plaintiff reported being stiff in the morning with some swelling in her feet, ankles, knees, and hands, along with occasional warmth (Tr. 345). During a physical examination, the plaintiff's hands showed significant livedo reticularis (a vascular condition characterized by purple discoloration of the skin) and associated Raynaud's syndrome, but no digital infarct (tissue death caused by lack of oxygen). The plaintiff's laboratory tests, including metabolic profile, rheumatoid factor, and ANF were within normal limits (Tr. 345), and Dr. Tracy diagnosed the plaintiff with osteoarthritis and fibromyalgia (Tr. 344). Dr. Tracy prescribed Oxy IR twice per day for her pain (Tr. 345). The plaintiff continued to see Dr. Tracy on a once-monthly basis through October 2007 (Tr. 340-65, 377-81, 386-90), but his notes do not reflect any physical examination of the plaintiff at any visit after the first one. His notes document the plaintiff's reported pain level and prescription modifications.

On June 8, 2005, state agency physician William Crosby, III, M.D., completed an RFC assessment regarding the plaintiff's ability to perform work-related activities (Tr. 227-34). He opined that the plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently; could stand/walk for six hours during an eight-hour workday; could sit for six hours during an eight-hour workday (Tr. 228); should never climb ladders, ropes, or scaffolds (Tr. 229); should limit overhead reaching on the right to frequently (Tr. 230); and

should avoid concentrated exposure to hazards (Tr. 231). Dr. Crosby's review of the records revealed that the plaintiff had full range of motion of all joints other than the right arm, normal motor and sensory function, and the ability to heel, toe, and tandem walk (Tr. 228-29).

On November 1, 2005, state agency physician W.B. Hopkins, M.D., completed an RFC assessment (Tr. 201-12). He opined that the plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently; could stand/walk for six hours during an eight-hour workday; could sit for six hours during an eight-hour workday (Tr. 204); should avoid concentrated exposure to extreme cold because of her history of Raynaud's syndrome (Tr. 205); and should avoid concentrated exposure to hazards based on her medications that could cause sedation (Tr. 205). Dr. Hopkins noted that the plaintiff's main problem was pain, but that her objective deficits were not consistent with her alleged degree of impairment (Tr. 206).

On November 7, 2005, Dr. Medlock opined that the plaintiff's fibromyalgia impacted her work related abilities as it was severe enough that she had to take Oxycontin. He opined that he did not think it was realistic for the plaintiff to attend to any sort of activity on an eight-hour per day, five-day per week basis. Dr. Medlock stated that the plaintiff would have to miss significantly more than one hour per day of work in light of the severity of her condition (Tr. 254).

On April 5, 2006, Dr. Medlock wrote that the plaintiff had pain, swelling, and marked erythema in both hands. The doctor noted that it did not appear to be dermatitis, but was likely a new response of some sort and that she had more problems with the proximal joints (Tr. 370).

In September 2006, Dr. Kooistra opined that the plaintiff's fibromyalgia limited her work-related activities. She noted that the plaintiff had significant problems with myofascial pain. Dr. Kooistra also noted that the plaintiff took significant narcotic pain

13

relievers and other medication for her fibromyalgia, but the medications were not controlling her pain. She opined that the plaintiff would need to rest for more than one hour during an eight-hour workday and would miss more than three days of any activity during a typical month. Dr. Kooistra stated that she based her opinion on the plaintiff's consistent pain at the appropriate trigger points, history of fatigue, and history of sleep disorder (Tr. 314). In November 2006, Dr. Kooistra assessed the plaintiff's fibromyalgia as stable (Tr. 374).

In November 2006, Dr. Tracy completed a questionnaire regarding the plaintiff's work-related limitations (Tr. 341-42). He indicated that the plaintiff could not perform light or sedentary work on an eight-hour per day, five day per week basis. Dr. Tracy further opined that the plaintiff would need to rest away from her work station for significantly more than an hour during the work day and would miss more than three days of work per month. Dr. Tracy opined that the plaintiff would have problems with attention and concentration in the work place. He indicated that the diagnoses underlying the purported limitations were the plaintiff's osteoarthritis and fibromyalgia (Tr. 341).

In June 2007, Dr. Medlock noted that the plaintiff's depression had improved as she increased her activity level (Tr. 382).

Dr. Tracy completed another opinion statement on the plaintiff's behalf in October 2007 (Tr. 386). He stated that the plaintiff had normal laboratory results, "tender trigger points at appropriate places," problems with sleep, and problems with any sort of repetitive activity. Dr. Tracy stated that the plaintiff had moderate to slightly severe osteoarthritic complaints in her shoulders, neck and back, which would not be disabling if those were her only problems. He explained that fibromyalgia was her worst problem. He opined that the plaintiff would miss hours out of the work day and days out of the work month. He stated that "any sort of activity that requires anything more than occasional repetition would be very fatiguing for her and she would have to rest for a substantial portion of any eight hour work day at even sedentary work" (Tr. 386).

On June 11, 2008, Dr. Tracy wrote that his diagnosis of fibromyalgia was based on a finding of trigger or tender points, which were objective signs indicative of the diagnosis. Dr. Tracy also wrote that Dr. Meadows had detected the same signs in her note of May 17, 1999, and that the plaintiff would be impaired from the side effects of her medication that she must take (Tr. 412).

Dr. Ruffing performed a second psychological evaluation on September 16, 2008, at the request of the plaintiff's attorney. The plaintiff stated that during her periods of depression she would have crying spells three times a month and periods when she felt worthless, hopeless, helpless, and useless. She also complained of low energy level, disturbed sleep and anhedonia. Dr. Ruffing wrote that the plaintiff's 2-4-7 triad profile code produced by the responses on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") were consistent with chronic depression in someone who was likely rather unhappy and that she was likely to display hostility and resentment. The results also revealed that the plaintiff may vacillate between pitying herself and blaming others for her problems in a somewhat immature and dependent fashion. Dr. Ruffing wrote that her behaviors would be chronic in nature and difficult to resolve through psychological interventions. Dr. Ruffing wrote that the plaintiff was likely to overact to even minor problems and that the plaintiff's profile code was frequently associated with chronic, severe alcoholism, combined with anxiety, guilt, and feelings of inferiority. Dr. Ruffing's diagnostic impression was that the plaintiff suffered from dysthymic disorder (Tr. 422-27, 431).

Dr. Ruffing also completed a questionnaire regarding the plaintiff's ability to perform work-related activities. On the questionnaire, Dr. Ruffing wrote that the plaintiff's ability to relate and deal with others may be impacted by her underlying anger and depression and that her low grade depression may impair her ability to maintain pace and consistency (Tr. 429-30).

15

In April 2010, Dr. Kooistra completed a questionnaire regarding the plaintiff's mental condition, stating that the plaintiff had depression, medication helped her condition, and she was fully oriented, had intact thought process, appropriate thought content, normal mood/affect, and good concentration and memory. Dr. Kooistra opined that the plaintiff had slight work-related limitations due to her mental condition (Tr. 760).

On June 7, 2011, Pranay Patel, M.D., of Westside Internal Medicine, examined the plaintiff at the Commissioner's request. Dr. Patel found that, despite her complaints of disabling, constant pain, the plaintiff's "blood pressure, heart rate, and respiratory rate were normal, which does not indicate physiological expressions of pain." Dr. Patel's examination showed that the plaintiff had good range of motion and no tenderness in her neck, no edema or tenderness in her calves, 5/5 strength in her upper and lower extremities, and normal reflex, sensory, and motor functioning. The plaintiff exhibited good range of motion and no swelling or tenderness of her joints and back. Her shoulder exam showed normal circumduction, abduction, and adduction; her hip exam showed normal internal and external abduction; and her wrist exam was normal. The plaintiff showed no muscle atrophy. The exam showed normal hand grip and grasp functioning. The plaintiff exhibited the ability to squat despite complaints of knee pain and, although she walked slowly, she did so "well and without any support or falls or any trouble with balance" (Tr. 761-63).

On July 26, 2011, Matthew Fox, M.D., a state agency reviewing physician, completed a physical RFC assessment and found that the plaintiff could perform a limited range of medium work. Dr. Fox's review of the records revealed that the plaintiff had good range of motion in the back and all joints, 5/5 upper and lower extremity strength, and a normal gait, albeit while walking slowly (Tr. 779-86). On September 22, 2011, Seham El-Ibiary, M.D., affirmed Dr. Fox's assessment after reviewing all of the evidence in the file (Tr. 788).

16

On August 18, 2011, Dr. Tracy provided a statement summarizing his treatment of the plaintiff and indicating that the limitations he described in October 2007 were still present.  Specifically, he stated that the plaintiff would not be able to persist in any kind of activity on an eight hour per day, forty hour per work week basis; the fatigue from her chronic pain conditions would cause her to need to rest away from the work station for more than an hour out of every work day; and she would tend to miss more than three days of work per month (Tr. 744).

On March 13, 2012, Dr. Medlock provided a statement regarding his long-term treatment of the plaintiff.  Dr. Medlock indicated that the plaintiff suffered from chronic widespread pain throughout the time that he treated her and that he had referred her to a specialist for her pain.  Dr. Medlock indicated that the plaintiff's neurologist had diagnosed her with fibromyalgia and peripheral neuropathy.  He also indicated that in recent years he primarily treated her for her other incidental medical problems as they arose.  Dr. Medlock explained that the plaintiff moved around slowly as if in pain and that she also had chronic headaches.  Dr. Medlock stated, "I believe that she has chronic pain because of the consistency of her presentation over time."  Dr. Medlock indicated that the plaintiff probably had some element of depression contributing to her problems.  He stated, "I would not employ[] her.  I suspect that she would call in sick often.  It is consistent with her condition that she would miss greater than 3 days of work per month on average based on my experience with her in the office over the years."  Dr. Medlock indicated that he prescribed her OxyContin because he believed she was in pain.  He stated, "I wish there was something more I could do to help her, but I feel like I have done all I can" (Tr. 789).

In a September 19, 2012, deposition, Dr. Tracy explained that he based the plaintiff's fibromyalgia diagnosis on clinical observation of fatigue, positive trigger points, and problems with sleep on a consistent basis over the years.  Dr. Tracy indicated that he did notice the plaintiff to be suffering from interruptions to concentration in his office "off and

17

on," especially early on. He confirmed that the plaintiff walked with a limp and explained that when he stated that the plaintiff's pain was controlled, he did not mean that she did not have the above-described limitations, which she had since approximately October 2007, though they had gotten about 20% worse in the last five years. He explained that to lower pain levels would require the use of more medication, which would then cause significant trouble with mental clarity and that the present level of medication was a "reasonable balance point." He stated that the plaintiff's appearance in the office was consistent with her subjective pain level ratings. Dr. Tracy noted that the plaintiff used a cane more in the cold, damp winter months as was appropriate for her condition. Dr. Tracy stated that the plaintiff had been compliant with treatment, did not play games with dosing, did not embellish her pain, and did not ask for increases in her medications. He stated that, like many fibromyalgia patients, she has trouble with concentration, getting easily confused, and having trouble with repetitive tasks. He explained that Dr. Kooistra's treatment had been helpful (Tr. 807-20).

### *Administrative Hearing*

At the December 7, 2007 hearing, the plaintiff testified that her daily activities included helping her ill mother, caring for her dog and cats, and spending most of her day in bed (Tr. 454, 459). She described providing her arm to her mother for balance and stability when her mother needed to be escorted to the bathroom or out of the bathtub (Tr. 456-57). She stated she brought food and drinks to her mother, although she did not prepare the food (Tr. 458). She testified she was not always able to help mother if she could not get herself out of bed (Tr. 458).

The plaintiff testified her hobbies included reading, singing, painting, and drawing. She reported painting about once every six months although she could not persist at painting for more than one hour (Tr. 465-66). The plaintiff testified that on days she had to go out of the house, such as the day of the hearing, she had a lot of pain and was

extremely exhausted afterward. She stated that activities such as showering that used to take her ten minutes, now take up to an hour (Tr. 460). She did not attend church or do yard work. She never had a driver's license, and she relied on others to take her places. The plaintiff said she used to perform, but now only sang for herself, and that she rarely went out to eat and never went to the movies (Tr. 462-65).

At the December 16, 2011, hearing, the plaintiff testified that her daily activities were "probably close to the same" as she had described at the earlier hearing, but she now had to spend more time in bed and she was weaker (Tr. 837).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly assess her credibility; and (2) failing to properly consider the opinions of her treating physicians.

### *Credibility*

The plaintiff first argues that the ALJ failed to provide adequate reasons for the assessment of her credibility (pl. brief at 10-29). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to

prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 416.929(c).

21

The ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 515). As noted by the ALJ, the plaintiff claimed that her ailments caused her constant pain, she spent most of her time in bed, and almost any activity caused fatigue and body aches (Tr. 514, 547-48). The ALJ acknowledged that the plaintiff's numerous medications supported her allegations "somewhat" (Tr. 514) and further noted that "in cases involving conditions like fibromyalgia, subjective statements, activities of daily living, and inconsistencies in the record are significantly important" (Tr. 516). The ALJ then summarized the record in thirty pages of discussion (Tr. 517-48) and further provided eight pages of discussion explaining why the plaintiff's allegations were only "partially credible" and the weight given to the plaintiff's treating physicians' opinions (Tr. 548-56).

In assessing the plaintiff's credibility, the ALJ found that the following evidence failed to support her subjective complaints: the plaintiff sought orthopedic care for her right shoulder impairment for only about four months (Tr. 512, 555); conservative treatment in the form of physical therapy greatly improved her right shoulder limitations and functioning (Tr. 512, 555); diagnostic imaging failed to fully support the plaintiff's allegations (Tr. 512, 553, 555); the plaintiff did not undergo injection into the subacromial space with Dr. Sanchez (Tr. 512, 555); she has not sought treatment with an orthopedist since 2005 (Tr. 512, 555); her last physical examination with Dr. Sanchez was relatively normal, which suggested stabilization of the right shoulder impairment (Tr. 512, 555); Dr. Sanchez did not articulate any work related limitations of function (Tr. 512, 555); despite notations of depression, anxiety, prescriptions for mental health medications, possible "fibro fog," and negative side effects from medications, Dr. Medlock confirmed in May 2005 that the plaintiff's thought processes were intact and thought content was appropriate, her mood and affect were worried and anxious, but her attention, concentration, and memory were

22

good (Tr. 517; *see* Tr. 252); while Dr. Medlock noted that the plaintiff was depressed, he provided no clinical signs; Dr. Medlock advised the plaintiff to change her lifestyle, including quitting smoking, exercising vigorously, working through the pain, and getting out of the house (Tr. 521; *see* Tr. 259); the plaintiff had generally not carried out Dr. Medlock's recommendations; Dr. Medlock noted that the plaintiff overreacts to all situations, which was consistent with Dr. Ruffing's interpretation of test results indicating the plaintiff had a tendency to overreact to even minor problems (Tr. 521; *see* Tr. 259, 426) and suggests that the plaintiff exaggerates her symptoms; while the plaintiff often complained of swelling in her legs and feet and high pain levels, treatment notes showed "largely normal" physical exams (Tr. 522-23, 554; *see* Tr. 255, 371-73); Dr. Medlock advised the plaintiff to partake in an "intensive exercise program" and yoga (Tr. 523, 554; *see* Tr. 383); the plaintiff told Dr. Medlock that she stood and walked a great deal in helping care for her mother, which was inconsistent with her testimony that she spent most days in bed (Tr. 524; *see* Tr. 415); Dr. Kooistra advised the plaintiff to participate in a more active physical therapy program in a pool (Tr. 527; *see* Tr. 329); the plaintiff did not see Dr. Kooistra between April 27, 2010, and August 15, 2011 (Tr. 530); at the August 15, 2011, visit with Dr. Kooistra, the plaintiff rated her pain at seven out of ten, but the physical examination normal (Tr. 530; *see* Tr. 745-46); despite complaints of poor gripping, the plaintiff had normal grip and grasp (Tr. 522-23; *see* Tr. 762-63); despite complaints of pain in the right knee, the plaintiff could squat with some pain (Tr. 533; *see* Tr. 762-63); the plaintiff's allegations of "fibro fog" were generally inconsistent with the results of mental status exams at the consultative and independent examinations (Tr. 539); the plaintiff's statement that she needed to be dismissed from physical therapy because her "arm is fine" was inconsistent with her allegations of significant shoulder pain (Tr. 539; *see* Tr. 242); despite claiming that sitting and standing for more than an hour caused severe pain, the plaintiff was able to complete the MMPI-2, which takes 60 to 90 minutes to complete (Tr. 544); despite her complaints of depression

and recommendations to seek psychological treatment by her physicians, the plaintiff received no inpatient or outpatient psychological treatment other than psychotropic medications (Tr. 545); Dr. Patel's examination of the plaintiff revealed normal findings (Tr. 546-47; *see* Tr. 761-63); in June 2004, the plaintiff stated that she needed help with personal care, had problems with eating, and did little, if any chores, cooking, or shopping, which was inconsistent with the plaintiff's statements to the consultative and independent examiners that she spent time reading, working on the computer, painting, playing with her pets, walking around the yard if she was able, and that she could handle her personal needs (Tr. 548; *see* Tr. 124-27, 181-83, 198-200, 421-31); despite complaints of pain at a level of seven or higher, the plaintiff's blood pressure readings were "consistently relatively normal" (Tr. 553); the plaintiff sought almost monthly treatment with Dr. Tracy primarily for medication refills since 2005, indicating that the treatment was somewhat more successful than the plaintiff reported as she did not seek evaluation with another rheumatologist (Tr. 554); while the plaintiff sought treatment in the emergency room three times since 2002, treatment was conservative in each instance (Tr. 555); and the assessments of the consultative examiners and state agency physicians did not fully support the plaintiff's subjective complaints (Tr. 548-55).

The ALJ noted Dr. Tracy's testimony that the plaintiff's blood pressure and pulse tended to be higher on days when she was in increased pain (Tr. 537 (citing Tr. 814)). The plaintiff argues that the ALJ's finding that her blood pressure "generally fall[s] within the normal ranges" is in error (pl. brief at 11-14 (citing Tr. 537-38)).[3]  Specifically, the plaintiff argues that, in his decision, the ALJ noted twenty-four normal blood pressure readings and two abnormal readings, when actually five of the cited normal readings were abnormal (*id.*

---

[3]The plaintiff notes that blood pressure is only normal where systolic pressure is below 120 and diastolic is below 80. American Heart Association, Understanding Blood Pressure Readings, http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/ AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Artic le.jsp (2015).

at 11 & n.7). Specifically, the plaintiff notes blood pressure readings of 124/80 (Tr. 383), 120/72 (Tr. 415), 118/84 (Tr. 791), 120/74 (Tr. 684), and 120/78 (Tr. 745), which were cited by the ALJ as normal (Tr. 523-25, 530). The plaintiff contends that these are "dramatic and critical inaccuracies in the facts as described in the ALJ's decision" (pl. brief at 13). In his discussion of the plaintiff's credibility, the ALJ noted that "[d]espite her complaints of pain at a level of 7 or higher, her blood pressure readings were consistently relatively normal" (Tr. 553). The undersigned cannot say that the ALJ's finding that this evidence weighed against the plaintiff's credibility was in error as the ALJ was clearly concerned with readings when the plaintiff complained of heightened pain, and the readings cited by the plaintiff as inaccurate are generally on the border between normal and abnormal readings. Moreover, to the extent that the ALJ may have improperly relied on these blood pressure readings, the error is harmless because the ALJ gave numerous other reasons for his credibility finding that were supported by substantial evidence. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff next argues that the ALJ's statement that Dr. Medlock's treatment records, overall, support the findings in the decision (Tr. 517) is factually inaccurate because the records cited by the ALJ contain "many entries" that support the plaintiff's allegations and her doctors' opinions (pl. brief at 14). As discussed above with regard to the plaintiff's credibility and below with regard to her treating physicians' opinion, the ALJ gave detailed reasons and support for his findings. The fact that the plaintiff might view the evidence differently or provide other evidence from which a different conclusion might be drawn is irrelevant. *See Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1973) ("[T]he fact that the record as a whole might support an inconsistent conclusion is immaterial . . . ." (citation omitted)).

25

The plaintiff further argues that the ALJ's citation to the record showing the plaintiff exceeded her OxyContin dose (Tr. 521) was in error because her "[ten] years of meticulous compliance is more probative of Cook's integrity that this incident is to the contrary" (pl. brief at 16).  The ALJ's recitation of the facts (Tr. 521; *see* Tr. 259) does not appear to be in error, and, even it was, the plaintiff further notes that "the ALJ never said that this rare event impaired her credibility; he simply recounted it" (pl. brief at 16).  This allegation is meritless.

The plaintiff next argues that the ALJ "confuses deliberate exaggeration, which the doctors explicitly say she does not have, with emotional fragility" (pl. brief at 17).  Specifically, the ALJ cited Dr. Medlock's treatment notes wherein Dr. Medlock "noted that the claimant overreacts to all situations," and the ALJ stated that this was consistent with Dr. Ruffing's testing that showed the plaintiff had a tendency to overreact to even minor problems (Tr. 521, 537, 545, 553; *see* Tr. 259, 426).  The plaintiff contents that the ALJ erred in concluding that the doctors' notations suggested that she "exaggerates her symptoms" (Tr. 537, 553), when this was really "emotional fragility" (pl. brief at 17).  The plaintiff also notes that Dr. Ruffing's testing showed that there was "no evidence for a negative response bias, either in an attempt to minimize and gloss-over emotional concerns or a tendency to exaggerate and magnify psychological symptoms" (Tr. 426).  Here, the ALJ acknowledged that the MMPI-2 testing was considered a valid representation of the plaintiff's emotional status (Tr. 543).  The undersigned sees no error in the ALJ's consideration of two doctors' assessments regarding the plaintiff's "tendency to overreact to even minor problems" and "overreact[] to all situations" (Tr. 259, 426) in assessing her subjective complaints.

The plaintiff also argues that it was error for the ALJ to consider Dr. Kooistra's recommendation to the plaintiff that she consider a "more active physical therapy program in pool" (Tr. 329) as weighing against her credibility (Tr. 527).  However, as the ALJ also

26

noted, Dr. Medlock also recommended that the plaintiff "exercise vigorously and work through the pain" and partake in an "intensive exercise program" and yoga (Tr. 523, 554; *see* Tr. 259, 383). As the ALJ found, such recommendations are "somewhat inconsistent with the claimant's reports that she is unable to engage in anything other than short periods of exertion" (Tr. 527; *see also* Tr. 523 (recommendation of "intensive exercise program is somewhat inconsistent with her alleged limitations"), 554 (recommendation to exercise and attend yoga is "somewhat inconsistent with the claimant's reported activity level")). As noted by the ALJ, the plaintiff claimed that at different times that she spent most of her time in bed, needed help with personal care, and almost any activity caused fatigue and body aches (Tr. 514, 547-48). Given the plaintiff's complaints of such extreme limitations, the undersigned sees no error in the ALJ's consideration of the doctors' recommendations of exercise in the assessment of her credibility.

The plaintiff also argues that intermittent good mental function is not inconsistent with "fibro fog" (pl. brief at 19-20). The plaintiff acknowledges the examinations in which she was found to have normal attention, focus, and memory, but argues that the record also shows that she often complained of trouble concentrating and remembering (*id.* at 20). Again, the evidence cited by the plaintiff shows her subjective complaints (*see* Tr. 721, 761, 777), and it was not error for the ALJ to consider the plaintiff's numerous examinations showing normal mental status findings as one factor in the assessment of her credibility. *See* SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

The plaintiff next takes issue with the following finding by the ALJ in discussing the plaintiff's right shoulder impairment:

27

> When the physical therapist instructed the claimant that she
> needed to concentrate on all of the exercises, "the claimant
> raised her arm up into the air with the weight in flexion to full
> range of motion, down in vertical abduction to shoulder level
> and then to adduction across her chest." She then stated, "My
> arm is fine and I need to be dismissed." Not only are the
> claimant's actions on this occasion inconsistent with her
> allegation of significant shoulder pain, they are somewhat
> inconsistent with her expression to Dr. Medlock that she was
> "receptive to anything" in regards to treatment modalities. The
> claimant was discharged from physical therapy secondary to
> her actions rather than an inability to complete the exercises.

(Tr. 539 (quoting Tr. 242)). The plaintiff contends that the improvement in her shoulder

"does not erase [her] fibromyalgia pain" (pl. brief at 20-21). The ALJ never made such an

assertion, and it was not error for the ALJ to consider the plaintiff's statements in physical

therapy in evaluating her shoulder impairment and RFC assessment.

The plaintiff argues that the ALJ's statement that the MMPI-2 takes

approximately 60 to 90 minutes to complete and the plaintiff was able to complete it was

speculative (Tr. 544) as the ALJ does not know if the plaintiff had to change positions or

how long the testing took (pl. brief at 22). The plaintiff also takes issue with the ALJ's

statement that she was able to complete the intake questionnaire and read the test protocol

because she did not indicate that she had a reading disability (*id.*; *see* Tr. 544). The

undersigned sees no error in the ALJ's consideration of this evidence in the context of the

whole record given the plaintiff's complaints of inability to concentrate and complaints of

severe pain after sitting more than an hour.

The plaintiff also complains regarding the ALJ's consideration of his own

observations of the plaintiff at the hearings and the observations of the state

representatives during their telephone conversations with the plaintiff (pl. brief at 23). The

ALJ stated that such observations were consistent with the mental limitations in the RFC

finding (Tr. 547). The ALJ found that the plaintiff was limited to simple, one- or two- step

tasks (Tr. 513). There was no error in the ALJ's reliance on this evidence – considered

along with other evidence – in making the RFC assessment.  It is permissible for the ALJ to consider in the credibility analysis, as one factor out of many, his observations at the hearing. *Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not *solely* base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (emphasis in original) (citations omitted); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations, and the ALJ may also consider any observations recorded by SSA personnel who interviewed the individual, whether in person or by telephone).  Here, the ALJ considered numerous factors in making the credibility determination as set forth above.

The plaintiff also finds fault in the ALJ's consideration of her daily activities (pl. brief at 24-27).  Specifically, she argues that the activities that the ALJ found to be inconsistent actually were not (*id.*).  The plaintiff also complains that some of the activities, such as painting, were done only infrequently, which the ALJ did not acknowledge (*id.* at 25; *see* Tr. 465-66).  The plaintiff further argues that since the magistrate judge in the plaintiff's prior case "has already found that this set of daily activities are perfectly consistent with disability," the ALJ is bound by that finding as law of the case (*id.* at 26).  As discussed above, the district judge declined to direct an award of benefits as recommended by the magistrate judge and remanded the case to the Commissioner "for further investigation or explanation" on the issues of the plaintiff's credibility and the treating physicians' opinions (Tr. 591-98).  The district judge also noted that the ALJ must "consider a claimant's activities of daily living . . . in his . . decision on credibility" (Tr. 591).  Here, the ALJ has endeavored to explain his assessment of the plaintiff's credibility in much greater detail than in the previous case.  While it is true that minimal daily activities do not establish that a person is capable of engaging in substantial gainful activity, the undersigned finds no error

in the ALJ's consideration of the plaintiff's daily activities in the assessment of her credibility.

Lastly, the plaintiff contends that the ALJ erred in suggesting "that the detail of the description of trigger points are not sufficient to establish fibromyalgia" (pl. brief at 28 (citing Tr. 529)).  However, as the plaintiff also notes, the ALJ specifically found that the plaintiff's fibromyalgia was a severe impairment (Tr. 508).  It appears to the undersigned that the ALJ's discussion of trigger points was in regards to the weight to be given to Dr. Kooistra's opinion that the plaintiff had extreme limitations as Dr. Kooistra's treatment notes did not document the positive findings of trigger points that she claimed supported her opinion (*see* Tr. 314 (opinion was based on the plaintiff's "consistent pain at the appropriate trigger points . . . ")).  As will be discussed below, the evidence with which a physician supports her opinion is an appropriate consideration by the ALJ. 20 C.F.R. § 416.927(c)(3).

Based upon the foregoing, the ALJ's credibility determination is based upon substantial evidence and without legal error.

### Medical Opinions

The plaintiff next argues that the ALJ failed to properly consider the opinions of her treating rheumatologist, Dr. Tracy; her primary care physician, Dr. Medlock; and her treating neurologist, Dr. Kooistra (pl. brief at  29-61).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the examining relationship; (2)  the length of the treatment relationship and the frequency of the examinations; (3)   the nature and extent of the treatment relationship; (4)   the evidence with which the physician supports his opinion; (5)   the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to

30

work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### 1. Dr. Tracy

As more fully set forth above, in November 2006, rheumatologist Dr. Tracy completed a questionnaire indicating the plaintiff could not perform light or sedentary work on an eight-hour per day, five day per week basis; she would need to rest away from her work station for significantly more than an hour during the work day; she would miss more than three days of work per month; and she would have problems with attention and concentration in the work place, all due to her osteoarthritis and fibromyalgia (Tr. 341-42). Dr. Tracy completed another opinion statement on the plaintiff's behalf in October 2007 opining that the plaintiff would miss hours out of the work day and days out of the work month. He stated that "any sort of activity that requires anything more than occasional

repetition would be very fatiguing for her and she would have to rest for a substantial portion of any eight hour work day at even sedentary work" (Tr. 386).

On June 11, 2008, Dr. Tracy wrote that his diagnosis of fibromyalgia was based on a finding of trigger or tender points and that the plaintiff would be impaired from the side effects of her medication (Tr. 412). On August 18, 2011, Dr. Tracy provided a statement summarizing his treatment of the plaintiff and indicating that the limitations he described in October 2007 were still present (Tr. 744).

In a September 19, 2012, deposition, Dr. Tracy explained that he based the plaintiff's fibromyalgia diagnosis on clinical observation of fatigue, positive trigger points, and problems with sleep on a consistent basis over the years. Dr. Tracy indicated that he did notice the plaintiff to be suffering from interruptions to concentration in his office "off and on," especially early on. He confirmed that the plaintiff walked with a limp and explained that when he stated that the plaintiff's pain was controlled, he did not mean that she did not have the above-described limitations, which she had since approximately October 2007, though they had gotten about 20% worse in the last five years. He explained that to lower pain levels would require the use of more medication, which would then cause significant trouble with mental clarity and that the present level of medication was a "reasonable balance point" (Tr. 807-20).

The ALJ discussed Dr. Tracy's treatment notes and opinions and gave a detailed analysis of his reasons for giving the opinions little weight (Tr. 531-38, 554-55). The ALJ noted that, despite the length of treatment, Dr. Tracy consistently prescribed the same treatment and never referred the plaintiff to another physician for further treatment. The ALJ explained that this indicates that the treatment was effective and more successful than what the plaintiff was reporting (Tr. 554). Dr. Tracy admitted at his deposition that the plaintiff's medication was "controlling her pain reasonably" to the extent that he did not need to order additional testing (Tr. 811-12). The ALJ further discussed Dr. Tracy's treatment

32

records and the record as a whole to support his decision to give little weight to Dr. Tracy's opinions (Tr. 531-32). The ALJ explained that Dr. Tracy's statement that the plaintiff walked with a cane, walked hunched over, and had an antalgic gait was not documented in the treatment notes (Tr. 532). As noted by the Commissioner, Dr. Tracy clarified at his deposition that the plaintiff "kind of limps" and sometimes uses a cane in the "cold damp winter months" (Tr. 812-15). The ALJ further noted that Dr. Tracy's records "provide almost no discussion of the claimant's level of functioning in terms of clinical signs, observations, or physical exams" (Tr. 534). Further, the ALJ pointed out that Dr. Tracy's conclusions are inconsistent with Dr. Patel's consultative examination (Tr. 532-33), which showed that the plaintiff had good range of motion and no tenderness in her neck, no edema or tenderness in her calves, 5/5 strength in her upper and lower extremities, and normal reflex, sensory, and motor functioning. She exhibited good range of motion and no swelling or tenderness of her joints and back; her shoulder exam showed normal circumduction, abduction, and adduction; her hip exam showed normal internal and external abduction; and her wrist exam was normal (Tr. 546). Despite allegations of significantly limited activity since 1998, the plaintiff showed no muscle atrophy, and, despite complaints of poor gripping, the exam showed normal hand grip and grasp functioning. Further, despite her complaints of right-knee pain, she exhibited the ability to squat. Lastly, although she walked slowly, she did so "well and without any support or falls or any trouble with balance" (*id*.).

The plaintiff points out several statements by the ALJ regarding findings that were not in Dr. Tracy's treatment notes, arguing that these are "true but irrelevant." However, as noted above, the evidence with which a physician supports his opinion is a valid consideration by the ALJ in assessing Dr. Tracy's opinions. 20 C.F.R. § 416.927(c)(3). The plaintiff also contends that the ALJ erred in considering references to the plaintiff "being stable" and "feeling better" (Tr. 534). As noted by the ALJ, Dr. Tracy referenced the plaintiff's treatment with other physicians as support for his opinions (Tr. 534). However,

in November 2006, when Dr. Tracy rendered his first opinion, the plaintiff was, according to Dr. Kooistra, satisfied with her medication regimen and her pain was stable (*id.*; *see* Tr. 374).  The plaintiff also argues that the ALJ contended that Dr. Tracy did not have sufficiently detailed findings in his office notes to properly diagnose fibromyalgia (pl. brief at 37 (citing Tr. 534)).  However, as noted above, the ALJ found that the plaintiff's fibromyalgia was a severe impairment, and there does not appear to be any question of diagnosis (*see* Tr. 537 ("[T]he issue is not necessarily the diagnosis of fibromyalgia, but its corresponding limiting effects on the claimant's [RFC].")).  However, the evidence – or lack thereof in this case – with which the doctor supported his opinion *is* a valid consideration for the ALJ in assessing the weight to be given such opinion, and the ALJ did not err in considering such.

The plaintiff also takes issue (pl. brief at 41-42) with the ALJ's statement that, while Dr. Tracy stated that the plaintiff was compliant with treatment, there was other evidence showing that the plaintiff altered dosages of medications without consulting with doctors, failed to seek mental health treatment despite being advised to do so, and, with regard to her last physical therapy session, could use her right arm in a manner more than she alleged at the time (Tr. 537).  The plaintiff argues that the ALJ ignored conflicting findings.  This argument is without merit.  The ALJ noted throughout his decision evidence that "somewhat" supported the plaintiff's subjective complaints (Tr. 508-56).  Moreover, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589 (citation omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987) (citation omitted).

### 2. Dr. Medlock

In May 2005, primary care physician Dr. Medlock completed a questionnaire at the Commissioner's request regarding the plaintiff's mental status. Dr. Medlock opined that the plaintiff's thought process and content were intact and appropriate, and her attention, concentration, and memory were good. He further opined that her mood and affect were worried and anxious (Tr. 252).

On November 7, 2005, Dr. Medlock opined that he did not think it was realistic for the plaintiff to attend to any sort of activity on an eight-hour per day, five-day per week basis. Dr. Medlock stated that the plaintiff would have to miss significantly more than one hour per day of work in light of the severity of her condition (Tr. 254). On March 13, 2012, Dr. Medlock stated, "I would not employ[] [the plaintiff]. I suspect that she would call in sick often. It is consistent with her condition that she would miss greater than 3 days of work per month on average based on my experience with her in the office over the years." Dr. Medlock stated that there was "probably some element of depression contributing to her problems" and indicated that he prescribed the plaintiff OxyContin because he believed she was in pain. He stated, "I wish there was something more I could do to help her, but I feel like I have done all I can" (Tr. 789).

The ALJ gave Dr. Medlock's May 2005 opinion regarding the plaintiff's mental status great weight (Tr. 517; *see* Tr. 252). The ALJ noted that, despite notations regarding depression and anxiety and the prescribing of mental health medications such as diazepam, Dr. Medlock still opined that the plaintiff's mental status was normal (Tr. 517).

The ALJ discussed Dr. Medlock's treatment notes and November 2005 and March 2012 opinions and gave detailed reasons for finding that the opinions should be given little weight (Tr. 517-25, 553-54). As noted by the ALJ (Tr. 517), Dr. Medlock admitted that he did not in recent years treat the plaintiff for her main ailments, but rather, he treated her only for her "incidental medical problems" (Tr. 789). Thus, as argued by the

Commissioner, it appears that he based his opinion on other physicians' diagnoses and the plaintiff's subjective complaints of pain.  Under the agency's regulations, the ALJ should discount the weight of the opinion in these circumstances:  "the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." 20 C.F.R. § 416.927(c)(2)(ii).  Further, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* § 416.927(c)(3).  As discussed in detail by the ALJ, Dr. Medlock did not conduct objective testing for fibromyalgia, such as an examination for tender points (Tr. 517-25, 553).

The ALJ discussed Dr. Medlock's treatment notes finding they did not support his extreme opinion.  As noted by the ALJ, with the exception of narcotic analgesics, Dr. Medlock did not provide any other treatment, such as physical therapy or other pain-relieving measures (Tr. 553).  Further, the plaintiff reported at times that her medications helped (Tr. 553; *see, e.g.*, Tr. 288, with the exception of her folliculitis, she is "doing very well otherwise"), 292 (reporting that the Neurontin has "definitely helped her").  Dr. Medlock also generally maintained medications at the same levels, which suggested that the plaintiff's medication controlled her pain (Tr. 554).

Dr. Medlock did not advise the plaintiff to restrict her activities; rather, he advised her to exercise vigorously, work through the pain, and get out of the house, which the ALJ found to be "somewhat inconsistent" with the plaintiff's reported activity level (Tr. 553-54; *see* Tr. 259 ("I told her that she needs a change of lifestyle. She needs to quit smoking.  She needs to exercise vigorously and work through the pain."), 272 (permitting the plaintiff to do yoga), 372 (recommending water exercises), 383 (recommending "an

36

intensive exercise and diet program"), 415 (urging the plaintiff to "get out and do recreational walking which I think would benefit her in many ways")). The undersigned sees no error in the ALJ's consideration of the Dr. Medlock's recommendations of exercise in the assessment of his opinions of the plaintiff's extreme limitations.

The plaintiff also takes issue with the ALJ's statement discounting Dr. Medlock's opinion that he "would not employ[] the claimant" because Dr. Medlock "is not an expert in vocational matters" (Tr. 518). As noted above, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions as they are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5. There is no indication that the ALJ rejected the entirety of Dr. Medlock's opinions on this basis as the plaintiff insinuates (pl. brief at 48-49). As discussed herein, the ALJ gave numerous reasons for the weight given to Dr. Medlock's opinions.

### 3. Dr. Kooistra

In September 2006, neurologist Dr. Kooistra opined that the plaintiff would need to rest for more than one hour during an eight-hour workday and would miss more than three days of any activity during a typical month. Dr. Kooistra stated that she based her opinion on the plaintiff's consistent pain at the appropriate trigger points, history of fatigue, and history of sleep disorder (Tr. 314).

The ALJ discussed Dr. Kooistra's treatment notes and opinion and gave a detailed analysis of his reasons for giving this opinion little weight (Tr. 525-31, 554). As discussed by the ALJ, Dr. Kooistra's treatment notes do not support her extreme opinion or the subjective complaints of the plaintiff. As noted by the ALJ, Dr. Kooistra "generally maintains the medication regimen, which suggests that the medications were somewhat helpful" (Tr. 554; *see, e.g.*, Tr. 375 (stating that the plaintiff's pain was stable and she was satisfied with her present regimen), 685 ("She has remained pretty much unchanged with limited resources on her current regimen . . . ."), 686 ("continue current regimen")). Despite

Dr. Kooistra's assertion that "consistent pain at the appropriate trigger points" supported her opinion, the ALJ properly found that Dr. Kooistra "does not consistently document positive findings for tender points, and other than the initial visit in August 2002, she does not describe the tender points as being on both sides of the body and above and below the waist" (Tr. 554; *see* Tr. 329 (noting trigger points on her right arm only)).  Further, Dr. Kooistra's notes do not reflect medical signs that are generally associated with disabling pain, such as high blood pressure, edema, significantly decreased strength, or atrophy (Tr. 554; *see, e.g.*, Tr. 374 (reporting only slightly reduced muscle strength of 4-/5 in the upper and lower extremities, as well as normal muscle tone and bulk), 684 (examination demonstrates normal tone, bulk, strength, fine motor movements, and gait), 686 (after more than a two-year absence from seeing Dr. Kooistra, the plaintiff's tone, bulk, strength, and reflexes remain normal), 745 (examination demonstrates normal tone, bulk, strength, fine motor movements, and gait)).  Further, Dr. Kooistra advised the plaintiff to increase her activity level, not restrict it (Tr. 554; *see, e.g.*, Tr. 329 (advising the plaintiff to "consider more active physical therapy program in pool")).

The ALJ gave great weight to Dr. Kooistra's remarks in April 2010 regarding the plaintiff's limitations due to mental impairment (Tr. 550), in which she stated that medication helped the plaintiff's depression; the plaintiff was fully oriented, had intact thought process, appropriate thought content, normal mood/affect, and good concentration and memory; and the plaintiff had only slight work-related limitations due to her mental condition (Tr. 760).

In her brief, the plaintiff points out numerous factual points made by the ALJ that she claims "do not show" that her subjective allegations were not credible nor that her treating physicians' opinions should be discounted.  However, "[a]ll of this, . . . is generally just a quibble of evidence, which, by standard of review, the Court cannot resolve.  There is no misstatement of fact or clear legal error in the ALJ's analysis or rationale provided.

The fact that the plaintiff might view the evidence differently or provide other evidence from which a different conclusion might be drawn is simply of no moment." *Morgan v. Astrue*, C.A. No. 2:11-2022-DCN-BHH, 2013 WL 625097, at *7 (D.S.C. Jan. 30, 2013) (citing *Blalock*, 483 F.2d at 775), *adopted by* 2013 WL 633581 (D.S.C. Feb. 20, 2013). The scope of judicial review by the federal courts is specific and narrow under Section 205(g) of the Act, which provides that "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "The fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) . . . requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock,* 483 F.2d at 775 (citation omitted). The court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589 (citation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker*, 834 F.2d at 640 (citation omitted).

Based upon the foregoing, the undersigned finds that the ALJ's assessments of the treating physicians' opinions are based upon substantial evidence and free of legal error.

### 4. Other Medical Opinions

In making his RFC assessment, the ALJ gave the opinions and findings of several state agency physicians and consultative examiners great weight (Tr. 548-51). *See* 20 C.F.R. § 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants

. . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Specifically, on January 11, 2004, Dr. Hopkins, a state agency reviewing physician, completed a physical RFC assessment and found that the plaintiff could perform a limited range of light work (Tr. 549) finding that, despite the plaintiff's claims of pain all over, she had a normal gait and station, full range of motion of all joints other than her right arm, normal motor and sensory function, a general ability to squat and rise, and the ability to heel, toe, and tandem walk. The records also showed that the plaintiff could fully abduct and flex her right shoulder and had good grip strength and good range of motion of the cervical and lumber spine (Tr. 201-208).

The ALJ also gave great weight to the findings of Dr. Ruffing at his October 2004 examination of the plaintiff (Tr. 548-49). The plaintiff informed Dr. Ruffing that her depression had not been a problem in the past nine to twelve months, and she was not depressed on the day of the examination. She also stated that her depression had responded well to medication. The plaintiff described daily activities of reading, trying to work on her computer, painting, napping, playing with her pets, and walking around the yard

40

if she was able. Dr. Ruffing's impression was adjustment disorder with depressed mood, apparently in remission in response to her psychotropic interventions (Tr. 181-83).

On November 1, 2004, Dr. Scott, a state agency reviewing psychologist, reviewed the record and found that the plaintiff's mental conditions were nonsevere. The ALJ also gave this opinion great weight (Tr. 549). Dr. Scott noted the plaintiff responded well to medications and denied depression for the last nine months. The plaintiff's concentration, persistence, and pace were within normal limits, and there was no evidence of significant social limitations (Tr. 184-96).

Dr. Korn examined the plaintiff at the request of the Commissioner on December 29, 2004 (Tr. 198-200), finding the plaintiff had full abduction and flexion of the shoulders, despite discomfort on the right, and could internally rotate to about 70 degrees on the right, but only externally rotate to about 50 degrees on the right with pain at the endpoint. Dr. Korn also noted weakness to resisted external rotation and graded the strength at 3/5 to 3+/5. Dr. Korn noted most of the plaintiff's deficits were related to subjective complaints of pain, with the exception of her right shoulder, which would cause her to have difficulty performing duties above shoulder level with her right arm where any force was required. Dr. Korn also noted that the plaintiff would have limitation in the amount of force she could apply with the shoulder where there was a need for normal strength with external rotation of the joint (Tr. 198-200). The ALJ gave this opinion great weight and accounted for the limitations in the plaintiff's right upper extremity in the RFC finding (Tr. 513, 549).

On June 6, 2005, Xanthia Harkness, Ph.D., reviewed the record and found that the plaintiff's mental impairments were nonsevere, noting that the plaintiff responded well to medications, her concentration, persistence, and pace were within normal limits, and there was no evidence of significant social limitations (Tr. 213-25). The ALJ gave this opinion great weight (Tr. 549-50).

41

On June 8, 2005, Dr. Crosby, a state agency reviewing physician, completed a physical RFC assessment and found that the plaintiff could perform a limited range of light work, which the ALJ noted was "generally inconsistent with the claimant's alleged severity of the symptoms and limitations" (Tr. 550; *see* Tr. 227-34). Dr. Crosby's review of the records revealed that the plaintiff had full range of motion of all joints other than the right arm, normal motor and sensory function, and the ability to heel, toe, and tandem walk (Tr. 229). The ALJ gave this opinion great weight (Tr. 550).

On June 7, 2011, Dr. Patel examined the plaintiff at the Commissioner's request, and the ALJ gave Dr. Patel's examination great weight (Tr. 551; *see* Tr. 761-63). As set forth above, Dr. Patel's normal findings were inconsistent with Dr. Tracy's conclusions (Tr. 532-33).

On July 1, 2011, Martha Durham, Ph.D., reviewed the record and found that the plaintiff's mental impairments were nonsevere (Tr. 765-78), and on September 22, 2011, Dr. Harkness agreed with Dr. Durham's determination (Tr. 787). The ALJ gave both of these opinions great weight (Tr. 551).

The plaintiff contends that the ALJ should not have relied upon the assessments of the state agency physicians because some of their assessments preceded some of the assessments of the treating physicians (pl. brief at 54-55). An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012). Here, the ALJ considered the entire record, and in a detailed, fifty-two page, single-spaced decision (Tr. 506-557), he discussed the record evidence and gave numerous well-supported reasons for the limited weight he gave to the opinions of Drs. Tracy, Medlock, and Kooistra and the great weight

42

given to the opinions described above.  The undersigned finds that the ALJ's assessments of these opinions are based upon substantial evidence and without legal error.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 30, 2015
Greenville, South Carolina